NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SOON PARK,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>ERIC K. SHINSEKI,<br><br>　　　　　　　Defendant. | Civ. No. 10-6762 (KM)<br><br>**O P I N I O N** |

*Appearances by:*

THE BELL LAW GROUP, P.C.
By: Joseph J. Bell, Esq.
150 Mineral Springs Drive
P.O. Box 220
Rockaway, New Jersey 07866

　　*Attorneys for Plaintiff*

PAUL J. FISHMAN
UNITED STATES ATTORNEY
By: Peter G. O'Malley, Esq.
970 Broad Street, Suite 700
Newark, New Jersey 07102

　　*Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

　　This matter arises out of the involuntary commitment of Plaintiff Soon Park. On December 23, 2010, Plaintiff filed a Complaint against Defendant Eric K. Shinseki, Secretary of

the Department of Veterans Affairs, asserting a cause of action for discrimination based on national origin, in violation of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.

Defendant now moves for summary judgment on Plaintiff's claim.[1]  For the reasons set forth below, Defendant's motion is GRANTED.

## I. BACKGROUND

Since 1992, Plaintiff has been employed as a medical technologist at the James J. Peters VA Medical Center in New York (the "VA").  Plaintiff is originally from South Korea, where she attended university, and has somewhat limited fluency in English.

Plaintiff generally received positive reviews at work.  However, she was suspended on two occasions.  In addition, when she made mistakes, she would say that it was someone else's fault and people were out to make her look bad.  (Shahidi Dep., 14-15.)  Indeed, she often harbored paranoid beliefs that many of her co-workers, particularly her supervisor, Darryl Williams, were "against her" and trying to "sabotage" her.  (Id. at 9); (Park Dep., 20.)

Plaintiff was also convinced that she, at times, "saw [Darryl] Williams standing in her bedroom in the doorway of the bathroom and the bedroom[.]"  (Shahidi Dep., 9.)  She said that although the bedroom door was locked from the inside, she could still see him.  (Id.)  Plaintiff further believed that, at times, she was being followed home from work and refused to enter her apartment.  On one occasion, Plaintiff called Dr. Shahidi late at night to say that she had been followed home, and that, "if I don't show up tomorrow, something happened to me."  (Shahidi Dep., 10.)  Dr. Shahidi ultimately encouraged Plaintiff to see a therapist, but Plaintiff refused, stating that it would harm her image in the Korean community.[2]

---

[1] See Note 6.

[2] Dr. Shahidi testified that Plaintiff told her that she saw a therapist in Korea, who told her that she was fine, but that she worked with very bad people.  (Shahidi Dep., 16.)  Plaintiff

2

Plaintiff also believes that she has been subject to harassment in the workplace, largely at the hands of Mr. Williams. Plaintiff recalls two specific incidents of harassment in 2003. The first incident took place when Plaintiff was asked by a cleaning person at work whether his cleaning team had done a good job cleaning a room that she has been working in. She told them that it was "beautiful; I like it." (Park Dep., 22.) The cleaning person left, but later came down with Mr. Williams and said that Plaintiff had told the cleaning person that his teams had done a poor job.

The second incident occurred when Plaintiff had received an incorrect lab sample from the VA's psychiatric ward. She placed a call to the psychiatric ward and, after beginning to explain the situation over the telephone, was told that her English was not understandable. Plaintiff believes that this was intentional. She further believes that Mr. Williams, along with three or four individuals in the psychiatric ward, would at times pretend not to understand her English.

Plaintiff recalls other incidents. At one point, when she had some sort of fungal infection, Mr. Williams asked her if all Koreans were infected by "that special fungus." (Id. at 82.) Plaintiff also recounts a time when she asked Mr. Williams for cleaning supplies, and Mr. Williams intentionally placed them on the floor so that she would have to bend over and pick them up. (Id. at 87-88.) Finally, she recalls an instance when Mr. Williams scolded her English based on her failure to distinguish between the words "order" and "odor." (Id. at 96.)

According to Plaintiff, this sabotage and harassment culminated in her involuntary commitment, on October 6, 2008. That morning, Plaintiff and a colleague, Luis Benabe, were

---

testified that she saw a psychiatrist at Dr. Shahidi's request and was prescribed medication, but refused to take it. (Park Dep., 29-30.)

3

engaged in conversation.  Plaintiff recalls that, during their conversation, Mr. Benabe told her that the VA knew a lot of personal things about her and that there were cameras installed in her home.  See (id. at 54-55).  Plaintiff responded that such activity would last until she died and asked why she had to kill herself.  (Id. at 55, 56).  According to Plaintiff, Mr. Benabe told her that if she wanted to die, she should starve herself to death, to which she responded that she could not kill herself because it would, as a matter of Korean culture, bring great shame to her family.  (Id. at 56.)

Plaintiff believed that Mr. Benabe was joking with her.  (Id. at 57.)  Therefore, she told him that, in order to die, she would have to be killed by an act of god and asked if he knew if anyone was planning on blowing up an airplane.  (Id.)  According to Plaintiff, "the whole conversation made no sense."  (Id.)

Mr. Benabe has a different recollection of this conversation.  According to Mr. Benabe, on the morning of October 6, 2008, Plaintiff appeared "upset" and "hesitant."  (Benabe Dep., 16.)  At approximately 10am, Plaintiff asked him who he thought were "watching these videos," to which he asked "what videos?"  (Shahidi Dep., 19.)  Plaintiff referred to the videos from the cameras in her apartment.  She was convinced that "they watch everything that I do."  (Id.)  Mr. Benabe told Plaintiff that she should change the lock on her door, to which Plaintiff responded, "[I]t doesn't help.  They come to my home and they come to my apartment.  I know this is someone from the hospital because they know when I'm not there."  (Id. at 20.)

Mr. Benabe then took a coffee break.  When he returned from his break, Plaintiff asked him if there was an easy way to kill oneself.  Mr. Benabe said that he jokingly responded that she could always stop eating.  Plaintiff responded that she did not want to starve and asked if there

4

was an easier way. Mr. Benabe then told Plaintiff that he was going to report her statement regarding suicide.[3] Plaintiff remained silent.

Mr. Benabe then approached Mr. Williams and told him that Plaintiff had asked how to kill herself.[4] (Benabe Dep., 22.) Plaintiff worked alone for several hours and "got very sad." (Park Dep., 57.) Specifically, she was upset that people hated her to the point that they were watching her and tapping her phone. (Id. at 57-58.) While she didn't have "clear evidence" of this, she could "feel" and "sense it." (Id. at 58.) At one point, she "cried a lot." (Id. at 58.)

At 2:30pm, Mr. Williams entered Dr. Shahidi's office and told her that Mr. Benabe had approached him and said that Plaintiff asked "if there was an easy way to kill oneself." (Shahidi Dep., 18.) Dr. Shahidi told Mr. Williams that they had to engage in suicide prevention measures.[5] Dr. Shahidi had Mr. Williams bring Mr. Benabe into her office to have him recount his conversation with Plaintiff that morning.

Thereafter, Mr. Williams and Dr. Shahidi reported the incident to a Dr. Paronetto, chief of pathology. They also called Lou Ruggiero, a VA supervisor. At 3pm, Mr. Ruggiero came to Dr. Shahidi's office with Amy Nathan, a mental healthcare worker, and asked Dr. Shahidi to call Mr. Benabe and Plaintiff into her office. Plaintiff "didn't know what was going on" and felt that she "was being bullied." (Park Dep., 59.) Mr. Williams was asked to wait outside. Ms. Nathan asked Mr. Benabe to recount his conversation with Plaintiff. Mr. Benabe told her that when he

---

[3] According to Mr. Benabe, Plaintiff had joked about killing herself to Mr. Banabe on prior occasions. But this time he believed that she was serious. (Benabe Dep., 17, 18.)

[4] Mr. Williams had also seen Plaintiff crying at her station that morning. Mr. Williams asked Plaintiff if she was ok, but Plaintiff did not respond.

[5] According to Dr. Shahidi, the VA had recently completed certain suicide prevention training and there was a suicide prevention policy in place. (Shahidi Dep., 18-19.)

5

returned from his coffee break that morning, Plaintiff asked him if there was an easy way to kill oneself.

Ms. Nathan then turned to Plaintiff and asked if this was true. Plaintiff was "shocked" and "didn't know what do say." (Park Dep., 60.) She felt unable to deny it because nobody would believe her. She also felt that this incident was part of a pattern and practice of "false accusations." (Id.) Plaintiff "just gave up and . . . said no comment." (Id.)

Ms. Nathan told Plaintiff that "this is serious." (Shahidi Dep., 22.) However, Plaintiff continued to say "no comment." (Id.) Ms. Nathan then told Plaintiff that people sometimes get depressed and encouraged Plaintiff to talk, but Plaintiff did not want to talk. Plaintiff left Dr. Shahidi's office, and Ms. Nathan followed her back to the lab.

Plaintiff told Ms. Nathan, "I'm not killing myself, don't worry. . . . I am depressed but I'm not killing myself. I never said anything like that." (Park Dep., 60-61.) However, Ms. Nathan refused to leave Plaintiff. Thus, Plaintiff relented and began to have a discussion with the Ms. Nathan. Ms. Nathan then left the lab. Thereafter, Dr. James Chou, a VA psychiatrist, Ms. Nathan, and two other individuals who Plaintiff does not remember, approached Plaintiff where she was working. Dr. Chou had recently been asked by a VA administrator to evaluate Ms. Park because she was exhibiting paranoid behavior and was asking how she could kill herself. See (Chou Dep., 21, 25.)

According to Plaintiff, as they began to speak, certain individuals began making a loud noise with a cart to prevent her from speaking. She believed that "this was to induce [her] or to take [her] to the emergency room." (Park Dep., 62.) Plaintiff further believed that "[t]he whole thing was set up. It was teamwork." (Id.) Dr. Chou then "said let's go someplace quiet." (Id.) Plaintiff followed Dr. Chou and ended up in the emergency room. Dr. Chou believed that he

6

needed to bring Plaintiff to the emergency room in order to conduct a complete evaluation because she was not being conversant in her work area. (Chou Dep., 22.)

Upon evaluation, Plaintiff appeared anxious, depressed, and paranoid. (Id. at 23.) She told Dr. Chou that people at work were conspiring against her by bugging her telephone, spying on her through her air conditioner, stealing her computer password, puncturing her tires, and blaming lab mix ups on her. (Id., Ex. 1.) According to Dr. Chou, Plaintiff said that these activities had been occurring for the past fifteen years and had recently gotten worse. (Id. at 23-24.) Plaintiff also mentioned that she was being watched at home, has trouble sleeping, and feels more depressed. (Id., Ex. 1.) She acknowledged the statements regarding suicide that she had made to her coworkers, but denied that she was suicidal. (Id. at 24-25, Ex. 1.) She said that, if she were actually suicidal, she would not tell anyone. (Id. at 25, Ex. 1.)

Plaintiff then tried to walk out of the emergency room but was stopped and told that, under the law, she had to be watched for 72-hours because she had tried to commit suicide. She protested that she was not trying to kill herself, but the staff refused to let her leave. Indeed, Dr. Chou decided that Plaintiff "clearly was psychotic" and exhibited "suicidal ideation." (Id. at 27.)

Plaintiff then called her cousin, a female attorney, for help. Her cousin showed up at the emergency room and told the staff that Plaintiff was not the type of person to attempt suicide, and that she would watch Plaintiff and ensure that she saw a psychiatrist. But the emergency room staff refused to let her leave.

Eventually, Plaintiff's cousin left, and Plaintiff was taken to the psychiatric ward where she was further evaluated. She was offered something to eat but refused, afraid that "they might put something inside my meal." (Park Dep., 69.) She also tried not to sleep because she "thought they could do something while I'm asleep." (Id.) However, she ultimately fell asleep.

7

The following day, Dr. Chou and his resident evaluated Plaintiff and decided to admit her. Plaintiff was also evaluated separately by a Dr. Kesselman, chief of the psychiatric ward. Dr. Kesselman wanted to keep Plaintiff at the hospital for a second night, to which Plaintiff angrily responded that she would have her cousin sue everyone if she was not released right then. Dr. Kesselman then agreed to speak with Plaintiff's cousin over the telephone. Shortly thereafter, Plaintiff was released to her cousin's custody.

Plaintiff showed up to work the following day without incident. Approximately one week later, the VA administration asked Plaintiff to get a psychological evaluation. She received an evaluation from Dr. Oh, who subsequently sent a letter to the VA detailing the results. Upon reviewing this letter, Mr. Ruggiero asked Plaintiff to take a leave of absence. In taking leave, Plaintiff was required to exhaust all of her sick and leave days for that year, in addition to taking time without pay. She returned to work in April 2009 after seeing another psychiatrist that found her fit to return to work.

Plaintiff was most recently evaluated by Dr. Dongsoo Kim, Ph.D., who Plaintiff retained as an expert for her lawsuit. Dr. Kim's report states that Plaintiff is "clearly psychotic" and suffers from paranoid delusions. (Kim Rep., 4.) The report points out a number of facts cutting against the clinical necessity of hospitalizing Plaintiff on October 6, 2008, including that (1) a "delusional disorder" generally presents itself without "suicidal ideation;" (2) Plaintiff was discharged from the hospital after just one day and allowed to return to work; and (3) at the time of Plaintiff's evaluation by Dr. Kim, Plaintiff "did not show any signs or symptoms suggesting depression and strongly denied suicidal ideation." (Id. at 5.)

On the other hand, Dr. Kim observed that Plaintiff is "extremely defensive and guarded," and was "trying to present an extremely favorable view of herself as honest, moral, and

conforming." (Id. at 4.) Therefore, according to Dr. Kim, "it is very likely that her profile is an underestimation of her psychological problems." (Id.)

## II. DISCUSSION

Defendant now moves for summary judgment on Plaintiff's claim, pursuant to Federal Rule of Civil Procedure 56(a).[6] In doing so, Defendant argues that the Complaint fails to state a claim under Title VII of the Civil Rights Act. Plaintiff argues that (1) Defendant's Motion for Summary Judgment fails because Defendant failed to provide a statement of undisputed material facts, in accordance with Federal Rule of Civil Procedure 56.1; (2) the Complaint and attached exhibits give rise to a claim under Title VII of the Civil Rights Act.

### A. Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

---

[6] In the alternative, Defendant moves to dismiss Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). Rule 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); see also In re Burlington Coat Factory, 114 F.3d at 1426 ("what is critical is whether the claims in the complaint are based on an extrinsic document and not merely whether the extrinsic document was explicitly cited."). However, in their motion papers, both parties attach exhibits not relied on, or intrinsic to, the Complaint.") Here, both parties attach several documents to their motion papers that are not intrinsic to the Complaint, and that the Court will not exclude. Consequently, Defendant's motion must be treated as one for summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In deciding whether a dispute of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. Id. at 251-52.

**B.     Plaintiff's Claim under Title VII of the Civil Rights Act**

The Complaint alleges that, "[a]s an employee who was born in South Korea and experiences difficulty in expressing herself clearly in the English language with respect to interpersonal communications and personnel-related matters in the workplace, Plaintiff was a clear target of the statements made by Louis Benabe and others that led to her detention in the psychiatric ward. Plaintiff is in a protected class of individuals who are protected from race, ethnicity, and national origin discrimination." (Compl. ¶ 25.)

Claims asserting unlawful discrimination under Title VII are demonstrated through the familiar analytical framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973). See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). The McDonnell Douglas analysis proceeds in three stages. As applicable here, Plaintiff must first establish a prima facie case of discrimination under the statute. McDonnell Douglas, 411 U.S. at 802. With respect to discrimination in the form of an adverse employment action, she must show that she (1) "is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the adverse employment action was made under circumstances that give rise to an inference of unlawful discrimination." Rodriguez v. Nat'l RR. Passenger Corp., 2013 WL 3814985, at *1 (3d Cir. July 24, 2013). With respect to discrimination manifested as harassment, Plaintiff must show that (1) she suffered from intentional discrimination because of her race or national origin; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in her position. Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007).

If she succeeds in establishing a prima facie case, the burden shifts to Defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action against Plaintiff. Id. If Defendant meets this burden, Plaintiff must then provide evidence that the legitimate reason offered by Defendant is merely a pretext for discrimination. Id. at 804-05.

Plaintiff fails to set forth a prima facie case of discrimination based on adverse employment action or harassment. With respect to adverse employment action, Plaintiff fails to satisfy the fourth element of a prima facie case. There is simply no indication whatsoever that Plaintiff's involuntary commitment or subsequent leave had anything to do with her status as a

Korean immigrant. To the contrary, the record suggests that it had everything to do with the fact that she suffered from paranoid delusions and had been mentioning the notion of suicide to her coworkers.

Similarly, there is no evidence that any perceived harassment was connected to Plaintiff's status as a Korean immigrant. While the majority of the perceived harassment was based on Plaintiff's admittedly limited command of the English language, taking a language barrier into account in the workplace does not, by itself, amount to unlawful discrimination. See Fragante v. City and County of Honolulu, 888 F.2d 591, 596-97 (9th Cir. 1989) ("There is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance." Citing EEOC Compliance Manual (CCH) ¶ 4035 at 3877-78 (1986)); see also Mejia v. New York Sheraton Hotel, 459 F. Supp. 375, 377 (S.D.N.Y. 1978) (Dominican chambermaid properly denied promotion to front desk because of her "inability to articulate clearly or coherently and to make herself adequately understood in . . . English.").

To be sure, Plaintiff points to an instance where Mr. Williams asked whether Koreans were infected by a certain fungus. However, even if this question amounted to intentional discrimination, there is no evidence that such questions were pervasive or had any detrimental effect on Plaintiff. Consequently, Defendant's Motion for Summary Judgment on Plaintiff's claim under Title VII for unlawful discrimination is granted.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. Plaintiff's Complaint is dismissed, in its entirety, with prejudice.

The Court will enter an order implementing this opinion.

           **/s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: December 16, 2013